1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                         DISTRICT OF OREGON

9                         PORTLAND DIVISION

10

11

12   SUSAN DAVIS,                          No. 3:12-cv-00635-HU

13           Plaintiff,                        **FINDINGS AND**
                                              **RECOMMENDATION**
14        v.

15   STATE OF OREGON, DEPARTMENT OF
     HEALTH AND HUMAN SERVICES, and
16   KOREN BROOKS, in her individual
     capacity,
17
             Defendants.
18   _____

19   Beth Creighton
     Michael E. Rose
20   Creighton & Rose, P.C.
     500 Yamhill Plaza Building
21   815 S.W. Second Avenue
     Portland, OR 97204
22
             Attorneys for Plaintiff
23

24   Ellen F. Rosenblum
     Attorney General
25   Steven M. Lippold
     Senior Assistant Attorney General
26   Department of Justice
     1162 Court Street NE
27   Salem, OR 97301-4096

28           Attorneys for Defendants

Page 1 - FINDINGS AND RECOMMENDATION

HUBEL, Magistrate Judge:

Plaintiff Susan Davis ("Plaintiff") brings this action against Defendants Oregon Department of Human Services ("the State") and Koren Brooks ("Brooks") (collectively, "Defendants"), her former employer and supervisor, respectively, alleging claims for intentional infliction of emotional distress ("IIED"), violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654, and violation of Plaintiff's substantive due process rights under the Fourteenth Amendment of the United States Constitution. Defendants now moves, pursuant to Federal Rule of Civil Procedure ("Rule") 56(c), for summary judgment on all of Plaintiff's claims. The Court heard argument on the pending motion on February 12, 2014. Having considered the parties' motion papers, pleadings and arguments, the Court recommends that Defendants' motion (Docket No. 44) for summary judgment be granted in part and denied in part.

## I. FACTS AND PROCEDURAL HISTORY

Upon being placed in the custody of the State, a number of medically fragile individuals, both children and adults, reside in state-operated group homes.[1] (Augsburger Decl. at 1.) The State is required to employ caregivers—classified as Habilitative Therapy Technicians or HTT's—to assist these medically fragile clients with their activities of daily living. (Augsburger Decl. at 1; Defs.' Mem. Supp. at 2.) There are also group homes for clients who exhibit violent and/or aggressive behavior due to

---

[1] The Court will refer to the individuals who have been placed in the custody of the State as "clients," consistent with the parties' briefing.

mental health conditions and are deemed to pose to a danger to themselves or others. (Augsburger Decl. at 1-2.) The caregivers that work with these clients are classified as Mental Health Therapy Technicians or MHTT's. (Augsburger Decl. at 2.)

At some time during 2007, an opening for an HTT was listed on the State's website and Plaintiff was hired to fill the position. (Davis Dep. 73:7-12, July 30, 2013.) Plaintiff understood that she would be working with medically fragile clients and hands-on care-giving would be required. (Davis Dep. 73:12-74:1, 75:6-24.) Roughly two years later, the State decided to transition a group home known as the Madison House into a facility for violent and/or aggressive clients based on need. (Augsburger Decl. at 2.) Since "[c]aregivers working in the new Madison House had to be classified as [MHTT's]" (Augsburger Decl. at 2; Davis Dep. 90:11-16), Plaintiff and the other HTT's currently working at the Madison House were given the option of relocating to a group home for medically fragile individuals or being promoted to an MHTT upon completion of the necessary training (Augsburger Decl. at 2; Davis Dep. 90:22-91:6).

The HTT's were educated on the characteristics of the violent and/or aggressive clients prior to the transition (Davis Dep. 88:7-22; Kamanda Dep. 15:2-15, Oct. 28, 2013), and Plaintiff was well aware that the Madison House's new clientele would be quite different from the medically fragile clients she had previously treated (Davis Dep. 89:3-7). In fact, a meeting was held where the State discussed each client's paperwork, medical history, diagnoses, issues, behaviors, and "things to look for" with the HTT's. (Davis Dep. 89:9-17; Kamanda Dep. 15:10-15.) Plaintiff

Page 3 - FINDINGS AND RECOMMENDATION

understood that MHTT's could be attacked by their clients, and she was even told a story about a man who ripped the lid off of a washer/dryer and beat a fellow client. (Davis Dep. 88:22-25, 89:18-25.)

Plaintiff ultimately chose to accept the promotion to MHTT and accompanying wage increase. (Davis Dep. 92:19-24.) Plaintiff signed a job description indicating that the MHTT position "would include working with combative, unpredictable, argumentative, aggressive, and developmentally disabled children or adults who may be a danger to themselves or others on a daily basis" (Davis Dep. 91:21-24, 92:9-15), and she understood that "was part of [the] job" (Davis Dep. 92:16-18). As part of her training for the MHTT position, Plaintiff learned about each of the clients that would be moving into the Madison House (Davis Dep. 93:4-7), and the overall understanding was that all of the new clientele could potentially target an MHTT—which "at times meant hitting, hair pulling, kicking, [and] biting" (Davis Dep. 94:1-9).

While Plaintiff's MHTT job description was dated February 6, 2010 (Davis. Dep. 91:16-24), the record suggests that: (1) the Madison House's new clientele arrived as early as December 2009 (Creighton Decl. Ex. 17 at 2); (2) a number of HTT's, including Plaintiff, worked with the new clientele for at least a month despite their classification (Second Augsburger Decl. Ex. A at 1-20); and (3) Plaintiff did not refer to herself as an MHTT until at least February 13, 2010 (Creighton Decl. Ex. 10 at 1, Ex. 11 at 1; Second Augsburger Decl. Ex. A at 22, 26, 35). It is hard to reconcile this with the State's representation that "caregivers

working in the new Madison House had to be classified as [MHTT's]."
(Augsburger Decl. at 2.)

Notably, however, Plaintiff's training included material on
S.B., a "very aggressive" minor whose paperwork indicated that she
"generally had a staff [member] that she targeted." (Davis Dep.
93:3-19; Creighton Decl. Ex. 2 at 1-2; Kamanda Dep. 15:2-15.)  More
specifically, S.B.'s paperwork indicated that: (1) her physical
aggression could be quite severe and intense; (2) she had a history
of hitting (e.g., with fists and heavy objects, such as phones),
kicking, biting and pulling the hair of peers and staff; and (3)
she would "specifically target people and ha[d] worked with other
clients to hold staff and aggress towards them." (Creighton Decl.
Ex. 2 at 2, 4.)

The record suggests the post-transition Madison House
generally consisted of four female clients split among the two
sides of the house based on age (Davis Dep. 115:17-23, 148:6-22),
and, depending on the shift, there were four or five caregivers
assigned to those clients (Augsburger Dep. 16:14-17:11, Oct. 25,
2013; Davis Dep. 125:23-24; Second Augsburger Decl. at 1).  More
recently, however, the State has used temporary and overtime
employees to increase the Madison House's daily staffing levels
because there were two clients who required a higher caregiver-to-
staff ratio (2:1 instead of 1:1). (Augsburger Dep. 27:13-22, 28:6-
9.)  One of those clients moved to the Madison House and the other
was increased to a 2:1 ratio due to self-injurious behavior.
(Augsburger Dep. 27:23-28:2.)  The Madison House's daily staffing

levels were sufficient "until the second person moved in."[2] (Augsburger Dep. 28:6-8.)

S.B. transferred to the Madison House in December of 2009, but the move proved to be difficult and she "became very physically aggressive on numerous occasions." (Creighton Decl. Ex. 17 at 2.) For example, S.B. targeted Plaintiff, who was still classified as an HTT at the time, with physical aggression and kicking on the evenings of December 28 and December 29, 2009.[3] (Creighton Decl. Ex. 5 at 1, Ex. 6 at 1.)   On January 9, 2010, S.B. had to be restrained by four individuals after attempting to assault various staff members with a metal window screen, punches, kicks, a large rock, and her own saliva. (Creighton Decl. Ex. 7 at 1-2; Second Augsburger Decl. Ex. A at 8-9.)  S.B. pulled Plaintiff's hair and punched her in the face, resulting in a scratch to her cheek and eye lid. (Creighton Decl. Ex. 7 at 2.)

On January 11, 2010, the site manager at Madison House explained to S.B. and the caregivers that shifting assignments had to be followed, meaning clients could not request "preferred staff." (Creighton Ex. 7 at 4.) Six days later, on January 17, 2010, S.B. had to be restrained after she began to push, hit, kick and spit at various staff members, including Plaintiff who was not

---

[2] At some unidentified time, a "panic bracelet"—that is, a wristband with a button, presumably used to alert other staff members when assistance was needed—was also introduced at the Madison House. (Jackson Dep. 49:19-24, Oct. 28, 2013; Augsburger Dep. 75:2-14.)

[3] Plaintiff was not the MHTT assigned to S.B. when the December 29th incident occurred. (Creighton Decl. Ex. 6 at 1.) Unless otherwise noted, the events described from this time forward pertain only to days where S.B. and Plaintiff were assigned to work together.

Page 6 - FINDINGS AND RECOMMENDATION

assigned to S.B. at the time.   (Creighton Ex. 8 at 1; Second Augsburger Decl. Ex. A at 12.)   The behavior specialist characterized the incident as a "common behavior demonstrated by [S.B.] almost since her initial move to the Madison [House]." (Creighton Decl. Ex. 8 at 3.)

On January 19, 2010, S.B. had a relatively brief, verbal outburst of profane language, but was otherwise pleasant for the remainder of Plaintiff's shift. (Second Augsburger Decl. Ex. A at 13-14.)   One week later, on January 26, 2010, S.B. became frustrated and angry when there was some confusion over staffing assignments (Creighton Decl. Ex. 9 at 1; Second Augsburger Decl. Ex. A at 17-18), and she eventually had to be restrained after, among other things, physically attacking Plaintiff and other staff members (Creighton Decl. Ex. 9 at 1, 5).   Two days later, on January 28, 2010, the behavior specialist notified the State that it took five people to restrain S.B., a show of police force was utilized and "certain staff d[id] not meet [the] proper height/weight ratio [to physically restrain S.B.]." (Creighton Decl. Ex. 9 at 4.)

The signatures affixed to the State's records suggest Brooks first became the site manager at the Madison House at or around the beginning of February 2010. (Creighton Decl. Ex. 9 at 4, Ex. 10. at 3, Ex. 18 at 1.)   S.B. exhibited physical aggression (kicking, spitting and punching) toward Plaintiff on February 2, 2010. (Creighton Decl. Ex. 10 at 1; Second Augsburger Decl. Ex. A at 22.) Three days later, Brooks noted that "staffing ha[d] been [temporarily] raised to help with future incidents of this sort." (Creighton Decl. Ex. 10 at 3; Augsburger Dep. 15:13-16:17.)

Page 7 - FINDINGS AND RECOMMENDATION

1   Plaintiff signed the MHTT job description the following day. (Davis
2   Dep. 91:16-24.)  Plaintiff's first assignment with S.B. as an MHTT
3   occurred one week later, on February 13, 2010, and S.B. exhibited
4   physical aggression once again (kicking, punching, spitting and
5   hair pulling).  (Creighton Decl. Ex. 11 at 1; Second Augsburger
6   Decl. Ex. A at 26.)

7       On March 10, 2010, Brooks met with Plaintiff to discuss
8   certain performance issues and Plaintiff expressed "concerns over
9   wanting to work only with certain clients."  (Creighton Decl. Ex.
10  18 at 1; Davis Decl. ¶ 10; Brooks Decl. at 1.)  Essentially,
11  Plaintiff wanted to work with S.B. less often because their
12  interactions were unhealthy and posed an unnecessary risk of
13  injury.  (Davis Dep. 109:5-12, 111:8-14, 115:6-9.)  Brooks told
14  Plaintiff that she had to follow staffing assignments and "if [she]
15  could not handle [the] job, perhaps [she] could work elsewhere."
16  (Davis Decl. ¶ 11; Davis Dep. 109:9-12; Creighton Decl. Ex. 18 at
17  1.)  Whether that meant "elsewhere" with the State or with another
18  employer is not discussed in this record.

19      The record also suggests that Brooks may have spoken with her
20  supervisor, Anne Augsburger ("Augsburger"), around this time and
21  was told "everybody needs to be able to work with everybody in the
22  house."  (Augsburger Dep. 6:3-9, 66:25-67:21.)  At some
23  unidentified time prior to taking FMLA-related leave, Brooks
24  apparently agreed to honor Plaintiff's request to put "a bigger
25  staff" member on S.B.'s side of the Madison House.  (Davis Dep.
26  111:4-6, 125:5-126:6; Davis Decl. ¶ 13.)

27      Plaintiff's next five assignments with S.B. occurred on March
28  10, March 22, April 20, May 9 and June 6, 2010, and S.B. was

Page 8 - FINDINGS AND RECOMMENDATION

polite, respectful and well behaved throughout each swing shift. (Second Augsburger Decl. Ex. A at 35, 41, 53, 61, 68.) On June 8, 2010, however, S.B. stated that she was going to kill Plaintiff, slapped her and tore some of her hair out. (Creighton Decl. Ex. 12 at 1; Second Augsburger Decl. Ex. A at 69.) Five days later, on June 13, 2010, S.B. exhibited physical aggression towards Plaintiff (hair pulling, punching and throwing a large cooler) and another staff member (throwing a small cooler). (Creighton Decl. Ex. 14 at 2; Second Augsburger Decl. Ex. A at 71-72.)

S.B.'s violence escalated on July 19, 2010, when she physically attacked Plaintiff and her assigned client, M.M., who resided on the same side of the Madison House. (Creighton Decl. Ex. 15 at 1; Davis Dep. 111:8-20, 115:17-23.) Plaintiff initially took M.M. outside after S.B. became verbally abusive and struck M.M. on the head. (Davis Dep. 115:24-116:23.) When they returned, S.B. was sitting on a couch and told Plaintiff not to look at her. (Creighton Decl. Ex. 15 at 1.) After Plaintiff responded to the statement, S.B. came barreling down the hallway and M.M. ran into a corner behind Plaintiff. (Davis Dep. 123:2-19; Creighton Decl. Ex. 15 at 1.)

As S.B. proceeded towards M.M., Plaintiff stood in between the two clients with her hands up in front of S.B., even though Plaintiff was not trained to react in that manner. (Davis Dep. 124:3-17, 125:5-8.) S.B. made a few attempts to strike M.M. and then took Plaintiff to the ground and punched her in the face repeatedly. (Davis Dep. 125:10-12, 127:7-15.) While Plaintiff was being attacked, S.B.'s assigned caregiver, Dequinta Kamanda ("Kamanda"), removed M.M. from the area and verbally instructed

Page 9 - FINDINGS AND RECOMMENDATION

S.B. to stop. (Davis Dep. 125:13-127:17; Second Augsburger Decl. Ex. A at 82; Creighton Decl. Ex. 15 at 1-3.) Although Plaintiff cannot recall how they were separated (Davis Dep. 128:15-17), the incident report completed by Kamanda and a fellow MHTT, Lester Jackson ("Jackson"), only references one unsuccessful attempt at protective physical intervention. (Creighton Decl. Ex. 15 at 1, 4-5.) That attempt at using a "belt shirt" was made by Jackson and it appears to have occurred when S.B. was no longer attacking Plaintiff. (Creighton Decl. Ex. 15 at 3-5.)

Almost immediately after the attack, Plaintiff went to an emergency room for treatment of contusions and an apparent broken nose (Davis Decl. ¶ 4; Jackson Dep. 50:10-12; Creighton Decl. Ex. 15 at 2, Ex. 17 at 3), and pressed charges (assault in the fourth degree) against S.B., who was taken to juvenile hall for assessment and released a few hours later (Creighton Decl. Ex. 15 at 2; Second Augsburger Decl. Ex. A at 82).[4]

---

[4] In support of her claim that the allegedly tortious conduct went beyond the farthest reaches of socially tolerable behavior, Plaintiff emphasizes that the State asked her to fill out an injury report and had Kamanda deliver the report to her house at an unspecified time. (Davis Decl. ¶¶ 5-6; Pl.'s Opp'n at 10, 32.) Kamanda had previously been placed on administrative leave and was required to undergo training on maintaining boundaries with clients based on a complaint filed by Plaintiff, presumably at some time prior to the July 19, 2010 incident. (Kamanda Dep. 8:12-14, 9:6-16, 11:17-25; Augsburger Dep. 80:11-81:6.) Because these allegations were not pled in the complaint, they will not be considered at this late juncture in the proceedings. *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment"); *Wasco Prods. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("summary judgment is not a procedural second chance to flesh out inadequate pleadings").

Page 10 - FINDINGS AND RECOMMENDATION

The State ultimately approved FMLA leave beginning on July 19, 2010, and Plaintiff requested that she never be assigned to work with S.B. in future.   (Davis Decl. ¶ 14; Davis Dep. 115:6-11; Creighton Decl. Ex. 22 at 1.)   According to the approval letter dated August 17, 2010, the State determined that Plaintiff's request for leave qualified under the FMLA for a pending State Accident Insurance Fund ("SAIF") claim. (Creighton Decl. Ex. 22 at 1.)   The record suggests that Plaintiff filed a workers' compensation claim, requested and took leave on the day of the attack, July 19, 2010.  (Davis Decl. ¶ 14.)

Plaintiff returned from her first period of FMLA leave on September 6, 2010 (Davis Decl. ¶ 14), and Brooks "was directed to not assign her to work with S.B. while she settled back into her position" (Brooks Decl. at 1).  Six days later, on September 12, 2010, Plaintiff suffered a major anxiety attack at work (Davis Decl. ¶ 15), but there is no indication that she was assigned to work with S.B. during this time period.  Soon thereafter, Plaintiff provided the State with a certification from a health care provider, indicating that she would be totally disabled from September 12, 2010, through October 11, 2010. (Creighton Decl. Ex. 21 at 1.)

When Plaintiff returned from the second period of FMLA leave on October 16, 2010, she initially did not work on S.B.'s side of the Madison House.  (Davis Decl. ¶ 16.)  That was consistent with Plaintiff's understanding that she "would not be reassigned to working in close proximity to S.B., which [wa]s one of the reasons [she] agreed to return to the Madison House." (Davis Decl. ¶ 16.) Plaintiff was aware, however, that she "moved around from different

Page 11 - FINDINGS AND RECOMMENDATION

clients . . . [and even on] the days [she] wasn't working with [S.B.] and . . . happened to be in the [area], [S.B.] would still attack [Plaintiff]." (Davis Dep. 106:20-25.) A few minutes prior to her shift on October 20, 2010, Plaintiff learned that she had been assigned to work with S.B. by Brooks yet again. (Davis Decl. ¶ 17; Augsburger 14:11-19, 72:18-20.)

Brooks claims that Augsburger, who oversees thirteen state-operated group homes and their site managers (Augsburger Dep. 6:3-9), "instructed [her] that [Plaintiff] had to return to a normal work rotation which would include periodic assignments to work with S.B." (Brooks Decl. at 1.) This occurred within a few days of Plaintiff's return to work. According to Augsburger, there were discussions regarding Plaintiff's future assignments, and she was told by the director, Deanna Bathke ("Bathke"), and human resources manager, Terri Millsap ("Millsap"), to not schedule S.B. with Plaintiff while her second leave request was being investigated. (Augsburger Dep. 10:5-9, 69:18-70:10, 71:13-72:1; Creighton Decl. Ex. 19 at 1.) While the timing is unclear, once that was resolved, Augsburger inquired about Plaintiff's status and Bathke informed Augsburger that the scheduling restriction was no longer in effect, which meant that Plaintiff could work with any of the Madison House's clients. (Augsburger Dep. 70:17-71:11.) Augsburger claims that she relayed that information to Brooks, but she did *not* require that Brooks assign Plaintiff to work with S.B. (Augsburger Dep. 72:18-23, 99:8-100:5.)

On October 23, 2010, S.B. threatened to "break [Plaintiff's] . . . nose next time" and told an unidentified staff member that she was "going to kill [Plaintiff]." (Davis Decl. ¶

Page 12 - FINDINGS AND RECOMMENDATION

18.)  The record is silent on whether Plaintiff was assigned to S.B. or was working with another client on October 23, 2010.  At some time thereafter, Plaintiff sought medical treatment for continued vertigo, ear pain and a cough, and "was taken off work until October 30, 2013." (Davis Decl. ¶ 19.)  Prior to October 30, while Plaintiff was off work, Brooks informed Plaintiff that she would be required to follow the staffing assignments at the Madison House, which in turn prompted Plaintiff to request a transfer. (Davis Decl. ¶¶ 20-21.)

In response to the transfer request, the State essentially provided Plaintiff with three options.[5]  The first option was to remain at the Madison House and work with S.B. periodically. (Def.'s Mem. Supp. at 5; Mot. Summ. J. Hr'g Tr. 59-60.)  The second option was to retain her MHTT status by working "for a period of time" at the Halsey House, which served the same type of clientele as the Madison House.  (Davis Dep. 148:23-149:5, 150:3-7.)  The third option was to demote without a decrease in pay and work as an HTT at the Hawthorne House, which was located right beside the Madison House, served less violent clientele and housed several

---

[5] During oral argument on the pending motion, the parties' counsel disagreed with the Court's suggestion that, at least on the record before the Court, Plaintiff was given three options.  (Mot. Summ. J. Hr'g Tr. 59-60, Feb. 12, 2014) ("MR. LIPPOLD: You are misunderstanding. The choice [was that she] could remain at Madison House where she was with the aggressive clientele there that included S.B. and others, or demote and move over to Hawthorne House which was a home only for what are called medically fragile [clientele who] are not combative or aggressive. . . . MR. ROSE: I find I don't disagree with counsel.")  Given the lack of an adequate explanation provided by the parties' counsel regarding the Halsey House option discussed below, the Court's characterization of the record remains unchanged.

familiar clients, including M.M.  (Davis Dep. 149:5-21, 150:8-12, 150:20-23, 151:2-8.)

Plaintiff's preference was to stay at the Madison House, but she was not amenable to being assigned to work with S.B.  (Davis Dep. 149:17-18; Davis Decl. ¶ 21.)  Plaintiff therefore chose to demote and work at the Hawthorne House based on the clientele and continued convenience of the drive.  (Davis Dep. 150:20-151:1.) Bathke sent an email to Augsburger, Brooks and others on November 18, 2010, confirming that Plaintiff had officially demoted to an HTT as of that day and her shift would remain unchanged at the Hawthorne House.  (Creighton Decl. Ex. 20 at 1.)  Plaintiff eventually transferred from the Hawthorne House to the Elliot House (Davis Dep. 151:9-14) before she apparently tendered her verbal resignation on February 29, 2012 (Davis Dep. 166:10-167:15).

Also on February 29, 2012, Plaintiff commenced an action against Defendants in Multnomah County Circuit Court, alleging claims for IIED, violation of the FMLA, and violation of her substantive due process rights under the Fourteenth Amendment. Service of process, however, was not effected until March 20, 2012. On April 11, 2012, Defendants removed the action to federal court on the basis of federal question jurisdiction.  28 U.S.C. § 1331. Defendants filed the pending motion for summary judgment on November 14, 2013.

## II. LEGAL STANDARD

Summary judgment is appropriate "if pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV.

Page 14 - FINDINGS AND RECOMMENDATION

P. 56(c).  Summary judgment is not proper if factual issues exist for trial.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  *Id.* at 324.  A nonmoving party cannot defeat summary judgment by relying solely on the allegations in the complaint, or with unsupported conjecture or conclusory statements.  *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  Indeed, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party.  *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982).  All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party.  *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).  Where different ultimate inferences may be drawn, summary judgment is inappropriate.  *Sankovich v. Life Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981).  However, deference to the nonmoving party has limits.  The nonmoving party must set forth "specific facts showing a genuine issue for trial."  FED. R. CIV. P. 56(e).  The "mere existence of a scintilla of evidence in support of

Page 15 - FINDINGS AND RECOMMENDATION

1  plaintiff's positions [is] insufficient." *Anderson v. Liberty*
2  *Lobby, Inc.*, 477 U.S. 242, 252 (1986).    Therefore, where "the
3  record taken as a whole could not lead a rational trier of fact to
4  find for the nonmoving party, there is no genuine issue for trial."
5  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.
6  574, 587 (1986) (internal quotation marks omitted).

**III. DISCUSSION**

**A.    IIED**

9       Defendants argue that they are entitled to summary judgment on
10  Plaintiff's IIED claim for two reasons.    First, Defendants argue
11  that Plaintiff's IIED claim against Brooks should be dismissed
12  because a tort claim cannot be maintained against a state employee
13  under the Oregon Tort Claims Act ("OTCA").    Second, Defendants
14  argue that the allegedly tortious conduct does not constitute an
15  extraordinary transgression of the bounds of socially tolerable
16  conduct.

17      To prevail on a claim for IIED, a plaintiff must demonstrate
18  that: "(1) the defendant intended to inflict severe emotional
19  distress on the plaintiff, (2) the defendant's acts were the cause
20  of the plaintiff's severe emotional distress, and (3) the
21  defendant's acts constituted an extraordinary transgression of the
22  bounds of socially tolerable conduct." *McGanty v. Staudenraus*, 321
23  Or. 532, 543 (1995) (quoting *Sheets v. Knight*, 308 Or. 220, 236
24  (1989)).    "The intent element of IIED is satisfied not only where
25  the actor desires to inflict severe emotional distress, but also
26  where he knows that such distress is certain, or substantially
27  certain to result from his conduct." *Derry v. EDM Enters., Inc.*,
28  No. 09-CV-6187-TC, 2010 WL 3586739, at *4 (D. Or. Sept. 13, 2010).

Page 16 - FINDINGS AND RECOMMENDATION

1  Ultimately, however, "the trial court plays a gatekeeper role in
2  evaluating the viability of an IIED claim by assessing the
3  allegedly tortious conduct to determine whether it goes beyond the
4  farthest reaches of socially tolerable behavior and creates a jury
5  question on liability." *House v. Hicks*, 218 Or. App. 348, 358
6  (2008).

7       Judge King's decision in *Estate of Pond v. Oregon*, 322 F.
8  Supp. 2d 1161 (D. Or. 2004), demonstrates that Plaintiff's IIED
9  claim against Brooks should be dismissed.  In that case, the
10 department of human services and three of its employees moved for
11 summary judgment on the plaintiff's wrongful death and 42 U.S.C. §
12 1983 claims.  *Id.* at 1165.  With respect to the wrongful death
13 claim, the defendants argued that the OTCA "requires that a public
14 body be substituted for state employees who are individually named
15 as defendants in a tort claim."  *Id.*  Judge King agreed in that
16 instance and dismissed the wrongful death claim against the
17 employees, leaving the department of human services as the only
18 remaining defendant.  *Id.; see also* OR. REV. STAT. § 30.265(1)
19 (stating that a "public body is subject to civil action for its
20 torts and those of its officers, employees and agents acting within
21 the scope of their employment or duties")

22      Plaintiff only disputes Defendants' argument regarding whether
23 the allegedly tortious conduct goes beyond the farthest reaches of
24 socially tolerable behavior.  Accordingly, because "[t]he OTCA
25 requires state-law tort claims asserted against state employees for
26 acts or omissions committed within the scope of their employment or
27 duties to be asserted against the State," *Hurley v. Horizon*
28 *Project, Inc.*, No. CV-08-1365-ST, 2009 WL 5511205, at *2 (D. Or.

Page 17 - FINDINGS AND RECOMMENDATION

Dec. 3, 2009), Plaintiff's IIED claim against Brooks should be dismissed, *see Estate of Pond*, 322 F. Supp. 2d at 1165 (same).

As to Plaintiff's IIED claim against the State, the Court agrees with Plaintiff that there is a genuine issue of fact as to whether the allegedly tortious conduct went beyond the farthest reaches of socially tolerable behavior. Defendants are correct that S.B. physically attacked other employees at the Madison House. Defendants are also correct that, prior to the July 19, 2010 incident, Plaintiff received training and signed a job description acknowledging her awareness of the risks associated with the MHTT position and the Madison House's new clientele. Nevertheless, there simply is nothing in the record that adequately explains why Plaintiff was assigned to work with S.B. on October 20, 2010, just four days after returning from the second period of FMLA leave, or why Plaintiff essentially had to decide whether she was willing to accept periodic assignments with S.B. prior to October 30, 2010, absent a requirement that such assignments were necessary at that time.

Indeed, the record evidence suggests, among other things, that: (1) the State had concerns about whether certain unnamed staff met the height/ weight ratio necessary to physically restrain S.B.; (2) the July 19, 2010 incident and subsequent anxiety attack had limited Plaintiff to roughly ten days of work prior to the October 20, 2010 assignment; (3) the exhibitions of physically aggressive behavior apparently were far more frequent when S.B. was assigned to work with Plaintiff; (4) Plaintiff requested that she never be assigned to work with S.B. after the July 19, 2010 incident that sent her to the emergency room for treatment of

Page 18 - FINDINGS AND RECOMMENDATION

contusions and an apparent broken nose; (5) Plaintiff agreed to return to the Madison House on October 16, 2010, based in part on an apparent understanding that she would not be assigned to work in close proximity to S.B.; (6) Brooks assigned Plaintiff to work with S.B. on October 20, 2010, even though Augsburger claims that she did not require Brooks to do so; and (7) between October 23 and October 30, 2010, while Plaintiff was off work for a third time, Brooks proceeded to inform Plaintiff that she would be required to follow the staffing assignments at the Madison House, which in turn prompted Plaintiff to request a transfer.[6]

As the Oregon Court of Appeals explained in *House*,

> [i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable [persons] may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

*House*, 218 Or. App. at 358 (citation omitted); *see also Miller v. Deschutes Valley Water Dist.*, 663 F. Supp. 2d 1001, 1009 (D. Or. 2009) ("If the minds of reasonable men would *not* differ on the subject, the court is obliged to grant summary judgment.") (emphasis added). A common thread in successful claims for IIED

---

[6] By the Court's count, S.B. was physically aggressive with Plaintiff on seven out of the thirteen occasions they were assigned to work together prior to October 20, 2010. Specifically, S.B. was physically aggressive on December 28, 2009, January 9, 2010, January 26, 2010, February 2, 2010, February 13, 2010, June 8, 2010, and June 13, 2010. S.B. was not physically aggressive on January 19, 2010, March 10, 2010, March 22, 2010, April 20, 2010, May 9, 2010, and June 6, 2010. In addition, S.B. was physically aggressive with Plaintiff on three occasions (December 29, 2009, January 17, 2010, and July 19, 2010) when they were not assigned to work together.

Page 19 - FINDINGS AND RECOMMENDATION

is the existence of a special relationship between the parties creating a heightened duty of care.  An Oregon appellate court recently acknowledged that, historically, the existence of a special relationship was a defining factor in every successful claim of [IIED] in this state, a fact which remains generally true even in recent cases.  The court specifically noted that 'courts are more likely to categorize conduct as outrageous when it is undertaken by the dominant party in a legal relationship.'  The types of relationships that have been held to support a claim for [IIED] are those that 'impose on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arms-length encounters among strangers' such as 'employer-employee, physician-patient, counselor-client, landlord-tenant, debtor-creditor, or government officer-citizen.'

*Giulio v. BV CenterCal, LLC*, No. 3:09-CV-482-AC, 2011 WL 3860443, at *15 (D. Or. Aug. 10, 2011) (internal citations omitted); *see also Delaney v. Clifton*, 180 Or. App. 119, 131 n.7 (2002) (noting that supervisor-employee is another type of special relationship in which an IIED claim has been successfully pleaded or proved).

Because reasonable minds could differ on the subject, it should be left for the jury, subject to the control of the Court, to determine whether the conduct in this case has been sufficiently extreme and outrageous to result in liability.  That is especially true in light of the fact that the supervisor-employee relationship between Brooks and Plaintiff created a heightened duty of care.  Yet, Brooks assigned Plaintiff to work with S.B., who was approaching eighteen years of age and who weighed nearly 300 pounds, within a few days of Plaintiff returning from a second leave period necessitated by an attack where S.B. took Plaintiff to the ground and punched her in the face repeatedly.  It was also within four days of an agreement apparently being reached concerning Plaintiff's future assignments with S.B.  Accordingly,

Page 20 - FINDINGS AND RECOMMENDATION

1  the Court recommends denying the Defendants' motion for summary

2  judgment on Plaintiff's IIED claim against the State.

3  **B.    FMLA**

4      Before turning to the merits, some clarification is necessary

5  regarding appropriate characterization of Plaintiff's FMLA claim.

6  The Ninth Circuit has recognized two theories for recovery on FMLA

7  claims under 29 U.S.C. § 2615(a), the "retaliation" or

8  "discrimination" theory and the "entitlement" or "interference"

9  theory. *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir.

10  2011); *see also Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298

11  F.3d 955, 960 (10th Cir. 2002) ("Courts have recognized two

12  theories for recovery on FMLA claims under § 2615, the retaliation

13  or discrimination theory and the entitlement or interference

14  theory.")

15      Under § 2615(a)(1), "[i]t shall be unlawful for any employer

16  to interfere with, restrain, or deny the exercise of or the attempt

17  to exercise, any right provided under [the FMLA]." 29 U.S.C. §

18  2615(a)(1). Claims under this provision are known as entitlement

19  or interference claims. *Sanders*, 657 F.3d at 778.[7] The Ninth

20  Circuit has declined to apply the *McDonnell Douglas Corp. v. Green*,

21  411 U.S. 792 (1973), burden shifting framework to FMLA interference

22  claims, choosing instead to allow an employee to prove such a claim

23  "by using either direct or circumstantial evidence, or both."

24  *Sanders*, 657 F.3d at 778 (citation omitted). When analyzing

25  interference claims, the employer's intent is simply irrelevant to

26  a determination of liability. *See Edgar v. JAC Prods., Inc.*, 443

27  ─────────────────

28      [7] The Court will refer to claims under § 2615(a)(1) as
    interference claims.

Page 21 - FINDINGS AND RECOMMENDATION

F.3d 501, 507 (6th Cir. 2006) ("The employer's intent is not a relevant part of the [interference] inquiry under § 2615."); *Branstetter v. Gen. Parts Distribution, LLC*, No. 3:12-CV-02328-KI, 2013 WL 6780672, at *6 (D. Or. Dec. 19, 2013) ("An employer's intent is irrelevant to a determination of liability in an interference claim.").

Under § 2615(a)(2), "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(2). Claims under this provision are known as discrimination or retaliation claims. *Sanders*, 657 F.3d at 777.[8] Although the Ninth Circuit has not spoken directly on the issue, "other circuits and courts in this district have adopted the *McDonnell Douglas* burden shifting framework when analyzing FMLA retaliation claims." *Schultz v. Wells Fargo Bank, Nat'l Ass'n*, No. 3:11-cv-1467-SI, 2013 WL 4782157, at *14 (D. Or. Sept. 5, 2013). Under that framework, once the employee makes a prima facie showing of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory explanation for the adverse employment action. *Id.* If the employer does so, the employee must offer evidence to demonstrate that the explanation was a mere pretext for retaliation. *Id.*

The Ninth Circuit has "clearly determined that § 2615(a)(2) applies only to employees who oppose employer practices made unlawful by FMLA, whereas, § 2615(a)(1) applies to employees who simply take FMLA leave and as a consequence are subjected to

---

[8] The Court will refer to claims under § 2615(a)(2) as retaliation claims.

unlawful actions by the employer." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133 n.7 (9th Cir. 2003); *see also Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001) (visiting negative consequences on an employee because of the use of FMLA leave is covered under § 2615(a)(1), the provision pertaining to interference with the exercise of substantive rights); *see also Schultz*, 2013 WL 4782157, at *8 (stating that "[w]hen a plaintiff alleges [the visitation of negative consequences] for exercising his or her rights under the FMLA, in the Ninth Circuit such a claim is properly analyzed as an interference claim").[9]

The parties' appropriately focus their arguments on whether Plaintiff was subjected to an adverse employment action. However, they also refer to Plaintiff's claim as a retaliation claim and cite to cases describing the legal standard applicable to § 2615(a)(2). *See, e.g., Price v. Multnomah County*, 132 F. Supp. 2d 1290, 1296 (D. Or. 2001) (setting forth the prima facie elements of a retaliation claim and the concomitant *McDonnell Douglas* burden shifting framework). Given the distinctions between retaliation and interference claims, addressing whether Ninth Circuit case law supports the parties' characterization is imperative in the FMLA context.

---

[9] In her complaint, Plaintiff alleges that "Defendants violated FMLA by retaliating and/or discriminating against and interfering with Plaintiff's exercise of her rights under FMLA." (Compl. ¶ 26.) But paragraphs fourteen and fifteen of the complaint clearly allege the interference claims described above. (Compl. ¶¶ 14-15) ("The fourth day after Plaintiff return[ed] from FMLA leave . . . Brooks informed [her] that she would be working with SB that day and from there on out. . . . When Plaintiff requested to be protected . . . she was told that she must take a demotion").

Page 23 - FINDINGS AND RECOMMENDATION

1    Reviewing the complaint and Plaintiff's opposition brief
2  demonstrates that Plaintiff is actually bringing an interference
3  claim under § 2615(a)(1).   It is alleged that Defendants: (1)
4  placed Plaintiff's safety in jeopardy by forcing her to work with
5  S.B. after returning from FMLA leave; and (2) forced Plaintiff to
6  accept a demotion——which did not include a decrease in pay——after
7  returning from FMLA leave.   The facts of this case, according to
8  Plaintiff, "support an inference that these adverse actions were
9  taken because of [her] leave."   (Pl.'s Opp'n at 28.)   Plaintiff
10  goes on to state that a reasonable jury could conclude that she
11  "was, in effect, punish[ed] for . . . taking protected leave," and
12  that she and other employees were dissuaded from exercising their
13  rights under the FMLA.   (Pl.'s Opp'n at 28.)

14    As Plaintiff emphasized in her opposition brief, "[e]mployers
15  cannot use the taking of FMLA leave as a negative factor in
16  employment actions, such as hiring, promotions or disciplinary
17  actions."   *Bachelder*, 259 F.3d at 1122, quoting 29 C.F.R. §
18  825.220(c).  That regulation promulgated by the Department of Labor
19  ("DOL") "is a reasonable interpretation of [§ 2615(a)(1)]'s
20  prohibition on 'interference with' and 'restraint of' [an]
21  employee's rights under the FMLA."   *Id.* at 1122-23.   Proceeding
22  under such a theory requires the employee to show by a
23  preponderance of the evidence that: "(1) the plaintiff took or
24  requested protected leave; (2) the employer subjected the plaintiff
25  to an adverse employment action; and (3) the taking of or
26  requesting protected leave was a 'negative factor' in the adverse
27  employment decision."   *Schultz*, 2013 WL 4782157, at *8 (citation
28  omitted); *see also Amway*, 347 F.3d at 1135-36 (employee must show

Page 24 - FINDINGS AND RECOMMENDATION

"by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the [adverse employment action]").

Defendants move for summary judgment solely on the ground that Plaintiff cannot establish the second element of a prima facie case—whether she was subjected to an adverse employment action. Defendants' argument is essentially that no adverse employment actions were taken; rather, Plaintiff was reinstated after returning from FMLA leave and subsequently made the decision to no longer work with S.B., which left her with three options. Since Plaintiff chose to demote to an HTT and work at the Hawthorne House, Defendants argue there cannot be a material issue of fact as to whether Plaintiff was subjected to an adverse employment action, as opposed to Plaintiff making a decision that was truly of her own volition.

"The Ninth Circuit defines adverse employment actions broadly," *Shepard v. City of Portland*, 829 F. Supp. 2d 940, 960 (D. Or. 2011), to include "any . . . action that would be reasonably likely to deter employees from engaging in protected activity," *Bushfield v. Donahoe*, 912 F. Supp. 2d 944, 955 (D. Idaho 2012). Some illustrative examples of actions that have fallen into that category are:

> a lateral transfer, or refusing a lateral transfer; undeserved negative performance evaluations or job references if motivated by retaliatory animus and not promptly corrected; being excluded from meetings, seminars and positions that would have made plaintiff more eligible for salary increases; being denied secretarial support; eliminating job responsibilities; and failure to be promoted or be considered for promotion.

Page 25 - FINDINGS AND RECOMMENDATION

*Shepard*, 829 F. Supp. 2d at 960 (citations omitted).   Another illustrative example is a change in work schedule.  *Bushfield*, 912 F. Supp. 2d at 955; *Garmon v. Plaid Pantries*, No. 3:12-CV-1554-AC, 2013 WL 3791433, at *19 (D. Or. July 19, 2013) (stating that "a more burdensome work schedule" may constitute an adverse employment action under the FMLA).

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the Court concludes there is a material issues of fact as to whether Plaintiff was subjected to an adverse employment action.  Plaintiff returned from the second period of FMLA leave taken because of the July 19, 2010 incident and subsequent anxiety attack on October 16, 2010.   Plaintiff's work schedule was altered four days later by Brooks, even though Augsburger claims she did not require that Brooks assign Plaintiff to work with S.B.   This was against a backdrop of previously not assigning Plaintiff to work with S.B. after the July 19, 2010 incident, and an apparent understanding between the parties that such assignments would no longer take place in the future.  (Davis Decl. ¶¶ 14-17.)

In addition, between October 23 and October 30, 2010, while Plaintiff was off work for a third time, Brooks proceeded to inform Plaintiff that she would be required to follow the staffing assignments at the Madison House (i.e., periodic assignments to work with S.B.), which in turn prompted Plaintiff to request a transfer because she "feared working with S.B. and Brooks insisted on scheduling [Plaintiff] with S.B. despite [Plaintiff's] . . . safety concerns."  (Davis Decl. ¶ 21.)   Plaintiff eventually

demoted to an HTT after the State provided her with certain options.

Applying the summary judgment standard, the Court concludes that a reasonable jury could find that the State subjected Plaintiff to an adverse employment action; or put another way, that the State attached negative consequences to the exercise of protected rights and effectively forced Plaintiff to request a transfer from the Madison House. *See Murphy v. Ohio State Univ.*, --- F. App'x ---, 2013 WL 5878184, at *6 (6th Cir. 2013) ("In addition to terminations and pay reductions, demotions and negative changes in job responsibilities [or work schedule] generally are sufficient to create a genuine issue of material fact as to whether the plaintiff suffered an adverse employment action"); *Mondaine v. Am. Drug Stores, Inc.*, 408 F. Supp. 2d 1169, 1202 (D. Kan. 2006) ("If an employer provides a strong disincentive against an employee taking FMLA leave, it violates [§] 2615(a)(1) of the FMLA.") Accordingly, the Court recommends denying Defendants' motion for summary judgment on Plaintiff's FMLA claim.

**C. Substantive Due Process**

Plaintiff's Fourteenth Amendment substantive due process claim appears to be brought against Brooks in her individual capacity. (Compl. ¶¶ 3, 8, 30-32.)   "To establish that a state official is personally liable in an action under 42 U.S.C. § 1983, a plaintiff must show that the official, acting under color of state law, caused the deprivation of a federal right." *Spoklie v. Montana*, 411 F.3d 1051, 1060 (9th Cir. 2005) (internal quotations omitted). The parties do not dispute that Brooks was acting under color of state law.

Page 27 - FINDINGS AND RECOMMENDATION

Generally speaking, the Due Process Clause of the Fourteenth Amendment does not confer any affirmative right to governmental aid, nor does it impose a duty on the state to protect individuals from third parties. *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). But there are two exceptions to this general rule. *Id.* The first exception arises when there is a "special relationship" between the plaintiff and the state. *Id.* (citing *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 198-202 (1989)). The second exception arises when the state affirmatively places the plaintiff in danger by acting with "deliberate indifference" to a "known or obvious danger." *Id.* at 971-72 (citing *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)).

Plaintiff's § 1983 claim is based on *Grubbs* and the state-created danger exception. (Pl.'s Opp'n at 19.) To survive summary judgment, the record must support, among other things, the contention that Brooks acted with deliberate indifference to a known or obvious danger. *See Patel*, 648 F.3d at 974. Brooks must have recognized an unreasonable risk and actually intended to expose Plaintiff to such risks without regard to the consequences. *Id.* That is to say, Brooks must have "know[n] that something [wa]s going to happen but ignore[d] the risk and expose[d] [Plaintiff] to it." *Id.* (quoting *Grubbs*, 92 F.3d at 900). *Grubbs* did not add "a requirement that the conscience of the federal judiciary be shocked by deliberate indifference . . . . Deliberate indifference to a known, or so obvious as to imply knowledge of, danger, by a supervisor who participated in creating the danger, is enough." *Grubbs*, 92 F.3d at 900.

The Ninth Circuit has allowed deliberate indifference theories to proceed to trial in only a few § 1983 opinions post-*Grubbs*. *See Patel*, 648 F.3d at 974 (collecting cases). In *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997), for example, the first responders to a 911 call were two police officers who found a man on his front porch in grave need of medical care. *Id.* at 708. For some unknown reason, the officers canceled the request for paramedics and then moved the man's body inside his house, where he ended up dying of respiratory failure. *Id.* The Ninth Circuit found a genuine issue of fact on deliberate indifference and allowed the § 1983 claim to proceed to trial. *See id.* at 710-11; *see also Patel*, 648 F.3d at 975 (citing *Penilla* for the same proposition).

In *Munger v. City of Glasgow Police Department*, 227 F.3d 1082 (9th Cir. 2000), officers arrived at a local bar after the bartender requested assistance with a belligerent patron. *Id.* at 1084. Even though the outside temperature was eleven degrees, with a windchill factor of minus 20-25 degrees, and even though the patron was only wearing a t-shirt and jeans, *id.* at 1084, the officers affirmatively ejected the patron from the bar, prevented him driving his truck or reentering the bar, and were aware that he was walking away from the nearby open establishments, *id.* at 1087. The next day, the patron's body was found curled up in an alleyway two blocks from the bar. *Id.* at 1085. The patron had died from hypothermia. *Id.* Applying the summary judgment standard, the Ninth Circuit concluded that there was a triable state-created danger claim. *Id.* at 1087.

In *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006), a family reported to police that their young daughter had

Page 29 - FINDINGS AND RECOMMENDATION

been abused a neighbors' mentally unstable son. *Id.* at 1057. When the officer was told that the family feared violent repercussions, he promised to provide a warning before he spoke with the neighbors about the allegations. *Id.* at 1058, 1063. The officer did not follow through on that promise, nor did he follow through on a promise to provide additional patrol cars on the night he spoke with the neighbors. *Id.* at 1058. The neighbor boy broke into the family's home that night and shot both parents. *Id.* That evidence created a genuine issue of fact as to whether the officer acted with deliberate indifference. *Id.* at 1064-65.

Plaintiff essentially claims that her Fourteenth Amendment due process rights were violated by Brooks because she placed Plaintiff in a position of enhanced danger, and as a result, Plaintiff was attacked by S.B. on July 19, 2010. (Compl. ¶ 30) ("Defendant Brooks acted with indifference to the danger she was creating and caused Plaintiff to be assaulted. Defendant Brooks acted with deliberate indifference when she engaged in this conduct. This conduct violated Plaintiff's [substantive due process] rights"). The state-created danger exception creates the potential for § 1983 liability where, in addition to certain other requirements, a state actor creates or exposes an individual to a danger which he or she would not have otherwise faced. *Campbell v. Wash. Dep't of Soc. & Health Servs.*, 671 F.3d 837, 845 (9th Cir. 2011). The present case, however, more closely resembles those cases in which the Ninth Circuit has declined to find a state-created danger exception.

*Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007), is an illustrative example. *Johnson* concerned a five-day Mardi Gras

Page 30 - FINDINGS AND RECOMMENDATION

celebration in Seattle's Pioneer Square District that unexpectedly evolved into a significant public safety threat. *Id.* at 636.  When the crowd again became violent on the fifth and final evening, the police decided to forgo a recently developed operational plan and not insert themselves into the crowd, fearing that would only incite greater panic and violence. *Id.* at 636-37.  The plaintiffs were beaten and injured by fellow party-goers at various times prior to the police ultimately deciding to use chemical agents to disperse the crowd because of increasing violence. *Id.* at 637.

The plaintiffs in *Johnson* claimed that their Fourteenth Amendment due process rights were violated by, among others, the police chief because his actions "affirmatively plac[ed] them in a position of enhanced danger." *Id.* at 635.  In affirming the district court's grant of summary judgment, the Ninth Circuit distinguished prior opinions that found a state-created danger exception, stating:

> In contrast to the plaintiffs in . . . *Penilla*, *Munger*, *Grubbs* and *Kennedy*, the Pioneer Square Plaintiffs have failed to offer evidence that the Defendants engaged in affirmative conduct that enhanced the dangers the Pioneer Square Plaintiffs exposed themselves to by participating in the Mardi Gras celebration.  The decision to switch from a more aggressive operation plan to a more passive one was not affirmative conduct that placed the Pioneer Square Plaintiffs in danger, because it did not place them in any worse position than they would have been in had the police not come up with any operational plan whatsoever.
>
> . . . .
>
> . . . [T]he fact that the police at one point had an operational plan that might have more effectively controlled the crowds at Pioneer Square does not mean that an alteration to this plan was affirmative conduct that placed the Pioneer Square Plaintiffs in danger.  The police did not communicate anything about their plans to the Pioneer Square Plaintiffs prior to the incident. Even if proved not the most effective means to combat the

Page 31 - FINDINGS AND RECOMMENDATION

1
2
3
4

> violent conduct of private parties, the more passive operational plan that the police ultimately implemented did not violate substantive due process because it placed the Pioneer Square Plaintiffs in no worse position than that in which they would have been had the Defendants not acted at all.

5   *Id.* at 641 (citation, internal quotation marks and brackets
6   omitted).

7        Similarly, in this case, Plaintiff has failed to offer
8   sufficient evidence that Brooks (or any other employee of the
9   State, for that matter) engaged in affirmative conduct that
10  enhanced the dangers Plaintiff exposed herself to, up to and
11  including July 19, 2010. It is undisputed that Plaintiff received
12  extensive training and briefing on the Madison House's new
13  clientele, including S.B., and Plaintiff signed a job description
14  indicating that the MHTT position "would include working with
15  combative, unpredictable, argumentative, aggressive, and
16  developmentally disabled children or adults who may be a danger to
17  themselves or others on a daily basis." (Davis Dep. 91:21-24,
18  92:9-15.) Plaintiff understood that "was part of [the] job" (Davis
19  Dep. 92:16-18) and that all of the new clientele could potentially
20  target an MHTT—which "at times meant hitting, hair pulling,
21  kicking, [and] biting" (Davis Dep. 94:1-9).

22       It is also undisputed that S.B. was willing and able to
23  physically attack Plaintiff on any given day at the Madison House
24  whether they were assigned to work together or not. (Davis Dep.
25  106:23-25.) And that's precisely what happened on July 19, 2010,
26  even though Plaintiff claims that Brooks's deliberate indifference
27  caused her to be assaulted. Setting aside the fact that Plaintiff
28  was still willing to work with S.B. as of July 19, 2010 (Davis Dep.

Page 32 - FINDINGS AND RECOMMENDATION

115:3-11), and the fact that Plaintiff concedes she was not trained to put herself in between two clients, Brooks's acts are not akin to those found in cases where the Ninth Circuit has recognized a state-created danger. *See, e.g., L.W. v. Grubbs*, 974 F.2d 119, 120-22 (9th Cir. 1992) (state hospital supervisor assigning nurse, who was led to believe that she would not be required to work alone with violent sex offenders, to work alone with a known, violent sex offender who was not qualified for the assigned position and raped the nurse).

Whatever liability Defendants may face should come from state tort law or the FMLA, not the Fourteenth Amendment, because, prior to July 19, 2010, Defendants placed Plaintiff in no worse position than that in which she would have been had they not acted at all. *Cf. Patel*, 648 F.3d at 976 (making an analogous observation). The Court therefore recommends granting Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim.

### IV. CONCLUSION

For the reasons stated, the Court recommends that Defendants' motion (Docket No. 44) for summary judgment be granted in part and denied in part.

///

///

### V. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due **May 12, 2014.** If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response

Page 33 - FINDINGS AND RECOMMENDATION

is due **May 29, 2014.**  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this __22nd__ day of April, 2014.

/s/ Dennis J. Hubel
_____
DENNIS J. HUBEL
United States Magistrate Judge

Page 34 - FINDINGS AND RECOMMENDATION